# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

STANLEY D. JONES,                    )
                                     )
      Plaintiff,                  )
                                     )
v.                                   )    Cause No.: 3:14-CV-135
                                     )
B & J ROCKET AMERICA, INC.,          )
                                     )
      Defendant.                  )

## OPINION AND ORDER

This matter is before the court on the motion for summary judgment (and memorandum in support) filed by the Defendant, B & J Rocket America, Inc. (DE 20 and 20-1). The Plaintiff, Stanley Jones, filed a response in opposition to the motion (DE 23) and B & J filed a reply brief (DE 24). For the reasons discussed below, the motion is GRANTED in part and DENIED in part. The motion is granted as to the Plaintiff's claims against the Defendant based on his demotion. The motion is denied as to the Plaintiff's claims based on his termination.

## BACKGROUND

Stanley Jones began working for Middlebury Enterprises, Inc., the predecessor of B & J, in March of 1993 as a saw operator. Jones held various positions with the company, including press operator, press operator supervisor, and machine maintenance. Eventually, Jones was promoted to plant manager. In 2009, B & J purchased Middlebury and retained the latter's employees, including Jones. Jones' supervisors included Andreas Müller, the President of B & J, Bent Toft Andersen, the General Manager of Manufacturing, and his direct supervisor was Todd Hart, General Manager. In 2011, B & J decided to hire a new plant manager. According to B & J, "[t]his decision was ultimately made by Andreas Müller, based on Bent Andersen's

recommendation that the Plaintiff lacked the necessary administrative and technical skills and was not satisfactorily fulfilling the job responsibilities for the role of plant manager." Defendant's Memorandum, p. 4. B & J also claims that "Bent Andersen's recommendation was based on his own observation of the Plaintiff's lack of understanding of finances, lack of managerial skills, and lack of technical skills necessary to assist in solving quality issues." *Id*. On March 5, 2012, B & J hired Mark Wallick as its new plant manager. Jones was 63 years old at the time and Wallick was "at least twenty years younger . . . ." Plaintiff's Response, p. 5. When Wallick was hired, Jones was "demoted to assistant plant manager." Defendant's Memorandum, p. 5. In October 2012, B & J informed Jones "that, in order for him to continue working for the Defendant, his [salary] would need to be reduced . . . [by] approximately $200 per week." *Id*., p. 6. Finally, "[o]n October 19, 2012, Mark Wallick–the Plaintiff's direct supervisor–made the decision that the plaintiff's employment should be terminated as a result of his failure to satisfactorily perform his job responsibilities as assistant plant manager." *Id*.[1] Wallick conveyed his concerns to Andersen, who then "sought–and obtained–Andreas Müller's approval for the decision to terminate the Plaintiff. . . . A few weeks later, Mark Wallick informed the Plaintiff that his employment with the Defendant would be terminated at the end of the year." *Id*., p. 7. Jones was given three months of severance pay and signed a retirement announcement on December 3, 2012. *Id*. The retirement statement read, in its entirety, as follows:

---

[1] Specifically, Wallick claimed that he saw Jones "talking on the floor, not doing his job, not being on the floor and [his] attitude." Defendant's Memorandum, p. 6; Wallick-Andersen email exchange, DE 20-2, Exh. 6. Wallick also claimed that Jones "sits in his office on the computer and will not do a thing, tells people [on the floor] they are going to lose their job because . . . 'management [does not] have clue,' and sabotages and prohibits other employees from doing the things that need to be done." *Id*.

B & J Rocket America, Inc[.] would like to acknowledge Stan Jones and his 20 years of dedicated service with our company. Stan will be retiring December 31st 2012 as part [sic] of his retirement package he will receive 3 months of severance. Stan's payments will be distributed on the 1st payroll of each month, January through March 2013.

We, as a company, want to sincerely thank Stan for his loyalty and service through the years. Stan was a great asset and will be truly missed.

DE 20-2, Defendant's Exh. 8, Retirement Announcement. The announcement was signed by Andersen, Wallick and Jones.

In his response in opposition to B & J's motion, Jones presents a contrary version of his employment history with B & J and the events that led to his termination. Jones states that in February 2012 he was told by "an outside electrician who had done electrical work for [B & J] for many years . . . that the Company was looking for another Plant Manager." Plaintiff's Response, p. 4. Jones claims that he heard the same rumor from a maintenance employee at B & J. *Id*. Jones states that he confronted Andersen and asked if the rumors that B & J intended to hire a new plant manager were true. According to Jones, Andersen responded by saying "Yes, were replacing you because of your age and your health. But don't worry. You'll get to work until you're 66 because it's going to take a long time to train this new guy, whoever we find." *Id*.; (Jones Deposition, DE 23-2, Exh. 1, p. 36).[2] Jones testified that he responded by saying, "Okay. I'm fine with that." *Id*. Jones claims that it was his intention all along to work until age 66, and that he conveyed this intention to Andersen and other "B & J Rocket representatives" when he initially interviewed for continued employment following B & J's purchase of Middlebury. Plaintiff's Response, p. 10. In fact, Jones claims that during that initial interview, ". . . three

---

[2] Page 36 of Jones' deposition is missing from his designation of evidence. However, the page does appear in B & J's Exhibit 20 (DE 20-2) and contains the exact language quoted above.

representatives from B & J Rocket–Müller, Andersen, and another male–called each employee into the previous owner's office . . . and asked the individual if he or she was willing to stay at B & J Rocket America. . . . Jones said he was willing to stay and the B & J Rocket representatives said, 'Well, you're getting up there in age–how long do you want to work before you retire?'" It was at that time, says Jones, that he told the men he planned to work until age 66. Jones concedes that "Andersen does not recall this conversation." *Id.*, pp. 9-10.

Jones also states that he suffered with medical issues related to his legs throughout the time he was employed at B & J. Jones states that he was injured by shrapnel during the Vietnam War, and "was able to walk short distances, but he bought an electric scooter to travel longer distances. . . . Todd Hart, the General Manager at the time, approved the use of the electric scooter in the plant." *Id.*, p. 2. Jones' problems with his legs, which began in 1999, worsened, and "[in 2010, [he] had a stent placed in his right leg. . . . In the fall of 2011, [he] had bypass surgery in his left leg. . . . After the bypass surgery, [he] was off work for approximately two weeks. . . . Andersen knew that Jones had problems with his legs, needed the electric scooter, and had to take some time away from work to have these medical procedures performed." *Id.*, pp. 3-4.

Jones also states that he "was never told that there were any issues with the performance of his job. . . . At no point during his employment at B & J Rocket, before or after Wallick was hired, did Jones ever hear any concerns about his performance. . . . Wallick never wrote Jones up, gave him a performance review, or made any negative comments about Jones' performance." *Id.*, p. 7 (citing deposition testimony). Finally, Jones tells of an encounter he had with Müller at B & J's company Christmas party on December 19, 2012. According to Jones, Müller approached him

at the party and said, "Congratulations on your retirement. Got any plans?" Jones claims he responded, "[p]lans? What are you talking about? I didn't plan on retiring. Why is this happening?" Müller, according to Jones, responded by saying, "[j]ust business, Stan. Just business." *Id*., p. 8.

Following his retirement, Jones applied for unemployment compensation through the Indiana Department of Workforce Development. DE 20-2, Exh. 11, Adjudication Statements from IDWD. IDWD contacted Wallick to obtain a statement while the agency assessed Jones' application for benefits. In that statement, Wallick told IDWD that Jones kept changing his mind about when he was going to retire, that Jones "pissed the Head boss of the plant off . . . and the boss states he could no longer trust [Jones], so [Jones] was told he needed to retire . . . it was pretty much a force[d] to retire." *Id*. (B & J did not, however, contest Jones' application for unemployment benefits. *Id*.)

Jones filed a Charge of Discrimination with the EEOC on April 3, 2013, alleging that he was terminated because of his age and his disability. After receiving a Notice of Right to Sue letter, Jones filed this lawsuit, alleging in his Complaint that B & J discriminated against him in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*., and the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq*. Complaint, pp. 4-5. Additional facts will be discussed as they become relevant to the court's analysis.

## STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Disputes concerning

material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322; *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003).

Courts must also be mindful "that employment discrimination cases typically involve questions of intent and credibility," and resolution of those issues is the sole province of the jury. *Alexander v. Wisc. Dep't of Health and Family Svcs.*, 263 F.3d 673, 681 (7th Cir. 2001). Weighing evidence and making credibility decisions are jury functions, and it is not appropriate

for a judge to assume those functions when ruling on a motion for summary judgment. *Anderson,*
*477 U.S. at 255.* Accordingly, the court "'appl[ies] the summary judgment standard with special
scrutiny to employment discrimination cases, which often turn on issues of intent and
credibility.'" *Bob-Maunuel v. Chipotle Mexican Grill, Inc*., 10 F. Supp. 3d 854, 873 (N.D. Ill.
2014) (quoting *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002)).

## DISCUSSION

B & J bases its motion for summary judgment on two theories. First, B & J argues that
Jones "failed to timely file a charge of discrimination with respect to the Defendant's decision to
demote him from plant manager." Motion for Summary Judgment, p. 1. Second, B & J argues
that "the Plaintiff has failed to provide any evidence under the direct or indirect methods of proof
that would permit a jury to infer that discrimination motivated the Defendant's decision to
terminate the Plaintiff's employment as assistant plant manager." *Id*., pp. 1-2.

### I. Timeliness of Jones' EEOC filing.

As B & J correctly points out, "[a] district court cannot hear claims of employment
discrimination until after the plaintiff has timely filed a charge of discrimination." Defendant's
Memorandum, p. 10 (citing *McCombs v. Federal Exp. Corp*., 965 F.Supp.2d 1018, 1022 (N.D.
Ind. 2014)). As stated above, B & J contends that Jones failed to file a timely charge of
discrimination with regard to his demotion, and therefore any claim based on that event cannot
survive the Defendant's motion for summary judgment. *Id*., pp. 10-12.

A plaintiff asserting a claim for violation of the ADEA must file a charge of
discrimination with the EEOC within 180 days after the alleged discrimination occurs. *McKee v.
Eaglecare, LLC*, 2015 WL 4603206 (N.D. Ind. July 30, 2015). Discrimination claims under the

ADA must be filed with the EEOC within 300 days of the alleged unlawful practice. *Johnson v. City of Chicago Bd. of Educ.*, 2015 WL 6701767, at *5 (N.D. Ill. Nov. 2, 2015) (citing *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001)). Alleged discriminatory acts that do not fall within the relevant filing period are considered untimely and cannot be considered by the court. *Id.*, (citing *Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995)).

Jones filed his charge of discrimination on April 3, 2013. B & J argues that "contemporaneously with the hiring of Mark Wallick as the Defendant's new plant manager on March 5, 2012, the Plaintiff was demoted from plant manager to assistant plant manager. . . . This demotion–which undisputedly occurred on March 5, 2012–is the precise employment practice of which the Plaintiff complains. . . . [H]owever, the Plaintiff did not file his Charge of Discrimination with the EEOC until April 3, 2013, which was 395 days after he was demoted." Defendant's Memorandum, pp. 11-12. For this reason, B & J contends that its motion for summary judgment must be granted "with respect to the Plaintiff's claim that the Defendant discriminated against him when he was demoted." *Id.*, p. 12. Obviously, Jones' EEOC charge, as it relates to his demotion, was filed beyond the 180-day window for an ADEA claim and the 300-day window for an ADA claim.

Jones' response to B & J's timeliness argument consists of only two paragraphs, one of which reads, in its entirety, as follows:

> In March 2012, when Wallick was hired, Jones' pay was not cut, nor was Jones informed that he was going to be terminated at the end of the year. Jones first learned that his pay was cut on October 11, 2012, and learned that he would be terminated at the end of the year on October 22, 2012. Jones filed his Charge of Discrimination on April 3, 2013, 174 days after Jones' knowledge of the pay cut and 163 days afer Jones' knowledge of his termination. As such, Jones filed a timely charge of discrimination alleging discrimination on the basis of age and

disability.

Plaintiff's Response, p. 14. This short response is more significant for what it does not say rather than what it does, to wit: Jones makes no mention of his demotion nor does he dispute that the demotion occurred on March 5, 2012. Perhaps Jones is conceding this argument or perhaps, for whatever reason, he is not basing either his age claim or his disability claim on the fact that he was demoted. He does not explain either way. Also, the court notes that the demotion is not even mentioned in Jones' EEOC charge, which refers only to his termination as the adverse employment event on which he bases his age and disability claims. Defendant's Designation of Evidence, DE 20-2, Exh. 12. In any event, it is clear (and maybe even undisputed) that Jones' EEOC charge was not filed within the time limits imposed by statute, at least as they apply to the event of his demotion. Accordingly, Jones' demotion cannot serve as the foundation (i.e., adverse employment action) for either his ADEA claim or his ADA claim. B & J is entitled to summary judgment in its favor as to any claim asserted against it by Jones that is based on his demotion.

## II. Sufficiency of Plaintiff's Evidence.

B & J next argues that it is entitled to summary judgment on both Jones' age claim and his disability claim since "the Plaintiff has failed to provide any evidence under the direct or indirect methods of proof that would permit a jury to infer that discrimination motivated the Defendant's decision to terminate the Plaintiff's employment as assistant plant manager." Motion for Summary Judgment, pp. 1-2.

A plaintiff alleging employment discrimination can establish a prima facie case by utilizing either the direct or indirect method of proof. *Bisluk v. Hamer*, 800 F.3d 928, 934 (7th Cir. 2015). Under the direct method, a plaintiff must show that his employer made an adverse

employment decision "on an impermissible discriminatory basis." *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). Under the indirect method of proof, a plaintiff meets his initial burden by showing that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated more favorably. *Id.* (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006)). If a plaintiff establishes a prima facie case of discrimination, the employer must "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.*

However, as the Seventh Circuit has explained, the terms "direct" and "indirect" are "somewhat misleading," and "[t]he distinction between the two avenues of proof is 'vague.'" *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006) (quoting *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902–03 (7th Cir. 2006)). Because of this vagueness, the assessment of a plaintiff's discrimination claims at the summary judgment stage has become a finely nuanced endeavor, and so a careful examination of the many applicable legal rules is necessary.

To start, in *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008), the court, discussing the direct method of proof, wrote as follows:

> The nomenclature is misleading because the phrase "direct method" tends to imply that an employee only may proceed under the direct method with "direct evidence." *See Sylvester*, 453 F.3d at 902-03. We recently have explained, however, that this is not the case. "[D]irect" proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed

10

criterion (e.g., "You're too old to work here."), but also *includes circumstantial evidence* which suggests discrimination through a longer chain of inferences. *Luks*, 467 F.3d at 1053 (emphasis supplied).

The focus of the direct method of proof thus is not whether the evidence offered is "direct" or "circumstantial" but rather whether the evidence "points directly" to a discriminatory reason for the employer's action. *Burks v. Wisconsin Dep't of Transp.,* 464 F.3d 744, 751 n. 3 (7th Cir. 2006) (noting that the "'direct method' . . . requires the plaintiff to put forth evidence that demonstrates that she was a member of a protected class and '*as a result* suffered the adverse employment action of which [s]he complains'" (quoting *Sylvester*, 453 F.3d at 902)).

It is also important to note that in recent years the Seventh Circuit has sharpened the pencil a bit regarding the standard under which employment discrimination claims should be analyzed, regardless of the method of proof a plaintiff employs. As the court noted in *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 680 (7th Cir. 2012): ". . . we recognize that the direct and indirect methods for proving and analyzing employment discrimination cases are subject to criticism. They have become too complex, too rigid, and too far removed from the statutory question of discriminatory causation. *See Coleman* [*v. Donahoe*], 667 F.3d [835], 862-63 [(7th Cir. 2012)] (Wood, J., concurring)." Courts may "look away from the intricacies of the direct and indirect methods . . . and focus on the summary judgment evidence as a whole" in order to assess the sufficiency of a plaintiff's claims. *Good*, 673 F.3d at 680. This is what has come to be known as the "convincing mosaic" approach (*see Coleman*, 667 F.3d at 860), a sort of hybrid approach that considers whether a plaintiff has presented sufficient circumstantial evidence to raise a reasonable inference of discrimination, without strict adherence to whether that evidence fits neatly into the "direct" or "indirect" categories. *Id*.

Whether a plaintiff utilizes the direct method or the indirect method of proof, "[t]he ultimate question under both methods . . . is 'whether a reasonable jury could find prohibited discrimination.'" *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015) (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86,* 746 F.3d 835, 840 (7th Cir. 2014)).

Turning to the parties' arguments, B & J contends that Jones presents insufficient evidence to meet his burden under either of the conventional methods of proof. As for the direct method, B & J states that the only evidence Jones presents to support such a theory is Bent Andersen's alleged comment that Jones was going to be replaced as plant manager due to his "age and health." According to B & J, this comment, assuming it was made, does not constitute direct evidence of discriminatory motive for several reasons. First, "an isolated comment or stray remark is typically insufficient to create an inference of discrimination, unless it was (1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." Defendant's Memorandum, p. 14 (citing *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 806 (7th Cir. 2014)). B & J argues that "Andersen's alleged comment is insufficient to create an inference of discrimination with respect to the termination of the Plaintiff's employment because it is undisputed that Bent Andersen was not the decision-maker." *Id*. B & J states that the decision to terminate Jones was made by "three individuals: Mark Wallick, Bent Andersen, and Andreas Müller. . . . As the Plaintiff's direct supervisor, Mark Wallick made the decision that the Plaintiff's employment should be terminated as a result of his failure to satisfactorily perform his job responsibilities." *Id*. According to B & J, Wallick conveyed his concerns to Andersen, who communicated with Müller about the matter, and "Andreas Müller approved Mark Wallick's decision to terminate the Plaintiff." *Id*. To put it another way, B & J

argues that Andersen's alleged comment loses any inferential value to which it arguably is entitled since it was not made by the person who actually decided to fire Jones. B & J also argues that even if Andersen was the decision-maker, his alleged comment was made "more than 9 months before the Plaintiff's employment was terminated." *Id.*, pp. 15-16. According to B & J, this means that the comment was too remote in time to be considered evidence of discriminatory intent. *Id.*, p. 6 (citing *Thomas v. Fairfield Mfg'g Co., Inc.*, 2009 WL 1043959, at *7 (N.D. Ind. April 17, 2009)) (five-month period between alleged discriminatory comment and adverse employment action does not constitute suspicious timing). Finally, B & J also argues that even if Andersen's alleged comment is considered relevant and probative, it still does not constitute evidence of discrimination. On the contrary, says B & J, the comment "does not indicate any intention to take adverse employment action against the Plaintiff but, rather, merely referenced that the Defendant was searching for a plant manager for after [sic] the Plaintiff retires." *Id.*, p. 15. For all these reasons, B & J maintains that "the Plaintiff has failed to present any direct or circumstantial evidence that would permit the inference that unlawful discrimination motivated the Defendant's decision to terminate the Plaintiff's employment as assistant plant manager." *Id.*, p. 18.

Jones responds to B & J's arguments by pointing out that while Andersen's alleged comment came nine months before his termination, it was "made one week before B & J Rocket hired the significantly younger Wallick as the new Plant Manager." Plaintiff's Response, p. 17. For this reason, argues Jones, the comment was "causally related to the decision-making process" that led to his termination. *Id.* (citing *Marshall v. American Hosp. Ass'n*, 157 F.3d 520, 526 (7th Cir. 1998)) ("In order for isolated comments to be probative of discrimination, the comments

must be contemporaneous with the discharge *or causally related to the discharge decision making process*.") (internal citations omitted) (italics added). B & J also cites the *Marshall* case in support of its position. (*See* Defendant's Memorandum, p. 16, n. 6.)  B & J focuses primarily on the first part of that holding and argues that Andersen's comment cannot be considered because it was not contemporaneous with Jones' termination. Jones focuses on the second part and argues that the comment is probative because it was made just days before B & J hired the younger Wallick, and is therefore "causally related to the decision-making process that B & J Rocket underwent in deciding why to hire Wallick to replace Jones and ultimately terminate Jones." Plaintiff's Response, p. 17.

The court does not find B & J's arguments convincing. Andersen was undisputedly part of the chain of command and was personally involved in the decision-making process that resulted in the hiring of Wallick and, ultimately, the firing of Jones.[3] B & J presents no convincing authority to support its argument that Andersen's alleged comment should have no probative value because Andersen was not the guy who pulled the trigger, as it were. And while B & J also contends that the alleged comment could actually be interpreted as probative of the company's *non*-discriminatory motivation (i.e., B & J was merely preparing for what it thought

---

[3] Recall that B & J states in its memorandum that Bent Andersen made the decision to hire a new plant manager, and that this decision was "based on [Andersen's] *own observation* of the Plaintiff's lack of understanding" of the duties of his job. Defendant's Memorandum, p. 4 (italics added). Then, 10 pages later, B & J takes pains to argue that Jones cannot point to Andersen's alleged comment as worthy of an inference of discrimination because it was really "Wallick [who] made the decision that the Plaintiff's employment should be terminated[.]" *Id.*, p. 14. Granted, the former decision was limited (at least according to B & J) to whether to hire a new plant manager, while the latter decision involved Jones' termination. Still, Andersen's admitted involvement in the entire process weakens B & J's argument that his alleged comment was not "causally related" to Jones' termination.

was Jones' inevitable retirement), such a conclusion is one that only a jury is empowered to make. Conversely, of course, Jones must convince the jury that the comment was made in the first place and that it is worthy of an inference of discriminatory intent. The probative value of the alleged comment cannot be assessed fairly absent credibility determinations, which are the exclusive province of a jury. This is all true regardless of whether the comment is characterized as "direct" evidence or is considered part of the broader "mosaic" the Plaintiff is attempting to present.

B & J also contends that Jones fails to establish a prima facie case under the indirect method of proof. As stated above, a plaintiff utilizing the indirect method of proof in a discrimination case must establish that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated more favorably. *Andrews*, 743 F.3d at 234. The first and third prongs are not disputed–Jones was a member of a protected class based on his age and disability,[4] and he suffered an adverse employment action. B & J does maintain, however, that Jones fails to present sufficient evidence to establish the second or fourth prongs. Defendant's Memorandum, p. 17 ("[I]t has always been the Defendant's position that the Plaintiff's employment was terminated due to his unsatisfactory work performance.") and p. 20 ("[T]he Plaintiff has failed to present any evidence that a similarly-situated employee outside of his protected classes received more favorable treatment.").

---

[4] B & J states that it "does not admit or concede that the Plaintiff is a qualified individual for purposes of the ADA. Rather, for purposes of this . . . motion . . . it is merely assumed that the Plaintiff is a qualified individual under the ADA." Defendant's Memorandum, p. 2, n. 1.

As to the second prong, there is quite clearly a genuine issue of fact regarding Jones' performance. B & J contends that he was not capable of handling the job of assistant plant manager and was terminated solely for that reason. Jones contends that he was never written up or reprimanded for poor performance–before or after Wallick was hired. And, nothing in the record indicates that any of Jones' supervisors ever voiced concerns about his ability to perform his job until Wallick came on board and claimed that Jones "sits in his office on his computer, [was] not doing his job," and allegedly made derogatory comments about management to other employees. *Id*., p. 22. B & J's spirited argument that Jones was terminated for poor performance cannot carry the day for the simple reason that the issue turns once again on credibility. Jones says he was meeting the company's expectations, as evidenced by the fact that he was never disciplined for (or even told about) any problems with his job performance until Wallick expressed his concerns to Andersen. Drawing all reasonable inferences in favor of Jones, the nonmovant, the court concludes that there is a genuine issue of fact with regard to Jones' job performance.

As to the fourth prong, B & J claims that "Mark Wallick was not a similarly-situated employee. More specifically, at the time of his termination, the Plaintiff was the assistant plant manager and Mark Wallick was the plant manager. These jobs have substantially different job responsibilities: the plant manager was in charge of plant operations–including ordering, scheduling, dealing with vendors, and managing employees–while the assistant plant manager scheduled maintenance and other service repairs. . . . In addition, Mark Wallick and the Plaintiff did not share a common supervisor; instead, Mark Wallick was the Plaintiff's direct supervisor." *Id*., pp. 20-21. This argument is loaded with hair splitting. It has become a common tactic (which

is not to imply an improper one) for defendants in employment discrimination cases to argue that

the plaintiff was not similarly situated to other employees who were arguably treated more

favorably (i.e., "comparators"), based on highly specific differences in job duties. This is so

because of language contained in some Seventh Circuit decisions addressing the issue of

comparators. For example, recently the appellate court wrote as follows:

> A similarly situated employee must be directly comparable to the plaintiff in all
> material respects, which is a common-sense, flexible analysis of relevant factors.
> *See Alexander* [*v. Casino Queen, Inc.*], 739 F.3d [972,] 981 [7th Cir. 2014]. These
> relevant factors often include whether the employees "had the same supervisor,
> were subject to the same employment standards, and engaged in similar conduct."
> *Majors v. General Elec. Co.*, 714 F.3d 527, 538 (7th Cir. 2013). Although the
> similarly situated inquiry is not a mechanical comparison, it requires enough
> common factors to determine if intentional discrimination was at play. *See
> Martino v. Western & So. Fin. Group*, 715 F.3d 195, 203 (7th Cir. 2013). In other
> words, "the purpose of the similarly situated requirement is to eliminate
> confounding variables, such as differing roles, performance histories, or
> decision-making personnel, which helps isolate the critical independent variable:
> complaints about discrimination." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387,
> 405 (7th Cir. 2007).

*Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504-05 (7th Cir. 2014).

Citing these cases, B & J argues that Wallick's job duties as plant manager were so

distinct from Jones duties as assistant plant manager that the two cannot be considered similarly

situated. Then there is B & J's contention that Wallick was not similarly situated to Jones

because they did not share a common supervisor–an argument that is even more of a stretch.

While it is true that a discrimination plaintiff and other employees designated as similarly

situated must be "comparable . . . in all material respects," it is also true that "'they need not be

identical in every conceivable way.'" *Brown v. Salvation Army*, 60 F.Supp.3d 971, 979 (N.D.

Ind. 2014) (quoting *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014)).

"[Courts] are looking for comparators, not 'clone[s].' *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 916 (7th Cir. 2010).

Both Jones and B & J cite *Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) in support of their respective arguments, which is not surprising since the case is chock-full of discussion about several of the factors that can be considered in assessing employment discrimination claims. So, again, a careful parsing of the language in *Coleman* is necessary before applying the principles discussed in that opinion to the context of this case. On the issue of comparators, the court in *Coleman* wrote as follows:

> So long as the distinctions between the plaintiff and the proposed comparators are not "so significant that they render the comparison effectively useless," the similarly-situated requirement is satisfied. *Humphries*, 474 F.3d at 405; see also *Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (the question is whether "members of the comparison group are sufficiently comparable to [the plaintiff] to suggest that [the plaintiff] was singled out for worse treatment").

> This flexible standard reflects the Supreme Court's approach to Title VII in *McDonnell Douglas* and its progeny. To offer a prima facie case of discrimination under the indirect method, the plaintiff's burden is "not onerous." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. The Supreme Court "never intended" the requirements "to be rigid, mechanized, or ritualistic ... [but] merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The Court has cautioned that "precise equivalence . . . between employees is not the ultimate question." *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 283 n. 11, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). The touchstone of the similarly-situated inquiry is simply whether the employees are "comparable." *Id.*, quoting *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817.
> . . .

> There must be "enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007). The "number [of relevant factors] depends on the context of the case." *Radue v. Kimberly–Clark Corp.*, 219

> F.3d 612, 617 (7th Cir. 2000). In the usual case a plaintiff must at least show that
> the comparators (1) "dealt with the same supervisor," (2) "were subject to the
> same standards," and (3) "engaged in similar conduct without such differentiating
> or mitigating circumstances as would distinguish their conduct or the employer's
> treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008),
> quoting *Snipes v. Illinois Dep't of Corrections,* 291 F.3d 460, 463 (7th Cir. 2002).
> This is not a "magic formula," however, and the similarly-situated inquiry should
> not devolve into a mechanical, "one-to-one mapping between employees."
> *Humphries*, 474 F.3d at 405.

*Coleman*, 667 F.3d 835, 846-47 (7th Cir. 2012). The purpose of the similarly situated inquiry is not to test a plaintiff's ability to jump through one more hoop in order to proceed with his case. Rather, it serves as a screen to prevent a plaintiff from going forward if the employees he names as comparators are clearly not comparable at all as a matter of law. *See, e.g.*, *Johnson v. City of Chicago Bd. of Educ.*, ___ F.Supp.3d. ___, 2015 WL 6701767, at *12 (N.D. Ill. Nov. 2, 2015) (plaintiff in race discrimination case cannot assert that employees of the same race are "comparators," since the statute requires that comparators be employees *not in the protected class*) (citing *Mintz v.Caterpillar, Inc.*, 788 F.3d 673 (7th Cir. 2014)); plaintiff cannot point to another employee as a comparator when that person was not employed with defendant at the time of the alleged discrimination. *Id.* (citations omitted).

Turning again to the parties' arguments, the court begins by noting that the Seventh Circuit has held that "'ordinarily, it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee[.]'" *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009) (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)). The operative word in that sentence is "ordinarily." But the present case is not ordinary in this sense. Jones was B & J's plant manager for several years until the day Wallick was hired and Jones was demoted, either formally or informally, to assistant

plant manager. Jones became Wallick's "subordinate" at that time, essentially by default. Of course, had Jones been terminated immediately, rather than seven months later, Wallick would unquestionably be a valid comparator, i.e., a similarly situated employee (he took over Jones' job), not in the protected class (he was 20 years younger and not disabled), who was treated more favorably (he became plant manager and Jones was terminated). But B & J insists that because Wallick was Jones' boss at the time of the events giving rise to this lawsuit, he cannot be held up as a valid comparator and Jones' case falls apart because of that fact. The court does not accept this argument, or the unduly harsh result that it demands. Recall that "[courts] are looking for comparators, not 'clone[s].'" *Chaney v. Plainfield Healthcare,* 612 F.3d at 916. Also, notwithstanding the general rule expressed in *Patterson*, a plaintiff may satisfy the fourth prong simply by presenting evidence that "'a replacement is substantially younger than the plaintiff.'" *Prochaska v. Menard, Inc.*, 829 F. Supp. 2d 710, 719 (W.D. Wis. 2011) (quoting in *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)). In this case, it is undisputed that Wallick was substantially younger than Jones. Given the facts of the present case, the court concludes that, as between Jones and Wallick, there exist "enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Barricks*, 481 F.3d at 560.

B & J's argument that Wallick is not a proper comparator because he was Jones' boss while Andersen and Müller were Wallick's bosses, i.e., the two men "did not share a common supervisor []" (Defendant's Memorandum, pp. 20-21) is hyper-technical and almost counterintuitive. It is undisputed that the chain of command at B & J consisted of Müller, the company president, Andersen, the company general manager, Wallick, the plant manager, and

Jones, the assistant plant manager. It is also clear from B & J's own account of the events leading up to Jones' termination that Wallick, Andersen and Müller were all involved in the decision-making process that resulted in that termination. B & J's argument that Wallick and Jones cannot be compared because they had different supervisors ignores the company's management hierarchy. B & J's position on this issue builds an artificial wall between Wallick and Jones on one side and Andersen and Müller on the other. But this wall has more holes than Swiss cheese and B & J's characterization of Wallick and Jones as having "separate supervisors" amounts to a "rigid [and] mechanized" (*Furnco*, 438 U.S. at 577) application of the factors used to assess whether a plaintiff and another employee (Wallick, in this instance) are similarly situated. Again, "precise equivalence . . . between employees is not the ultimate question." *McDonald*, 427 U.S. at 283, n. 11. Comparators need only be "sufficiently comparable to [the plaintiff] to suggest that [the plaintiff] was singled out for worse treatment." *Crawford*, 461 F.3d at 846.

Similarly, B & J's attempt to distinguish Wallick's job duties from Jones' (i.e., Wallick was responsible for "ordering, scheduling, dealing with vendors, and managing employees" while Jones "scheduled maintenance and other service repairs" (Defendant's Memorandum, pp. 20-21)), is also unavailing. It stands to reason that Wallick, as plant manager, would have different (and perhaps more) job responsibilities than Jones, the assistant plant manager. But this argument focuses solely on the different duties of the two men and ignores any similarities. Both were employed as managers at the plant, both were responsible for ensuring productivity at the plant (a responsibility that B & J says Jones failed to fulfill), and both were in the management chain of command. While Wallick's list of duties may have been longer than Jones' once Jones was demoted, it is a stretch to conclude from that fact that there existed between the two men

"'such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Gates*, 513 F.3d at 690 (quoting *Snipes*, 291 F.3d at 463). In other words, B & J's argument on this point amounts to the sort of "mechanical, 'one-to-one mapping between employees[ ]'" (*Coleman*, 667 F.3d at 846-47) that the district courts are urged to avoid.

Finally, the issue of "whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Coleman*, 667 F.3d at 846-47 (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)). Drawing all reasonable inferences in favor of Jones, the court concludes that Wallick and Jones were sufficiently comparable for Wallick to be considered a comparator–a similarly situated employee, not in the protected class, who was allegedly treated more favorably than the Plaintiff.

### III. Evidence of Pretext.

B & J argues next that even if Jones can establish a prima facie case of discrimination, he cannot establish that the company's proffered, nondiscriminatory reason for firing him was pretextual. Defendant's Memorandum, p. 21. The "failure of the Plaintiff to satisfactorily perform his job responsibilities is precisely the reason that his employment was terminated. . . . [T]here is no evidence or other information to suggest that the explanation proffered by the Defendant for its decision to terminate the Plaintiff's employment is unworthy of credence." *Id.*, p. 24. A jury may very well agree with B & J on this dispositive issue, but for present purposes the argument doesn't fly.

Pretext is defined as "'a lie, specifically a phony reason for some action.'" *Sokn v. Fieldcrest Cmty. Unit Sch. Dist. No. 8*, 2015 WL 183912, at *10 (C.D. Ill. Jan. 13, 2015) (quoting *Collins v. American Red Cross,* 715 F.3d 994, 1000 (7th Cir. 2013)). The relevant question is whether the justification for the adverse employment action was honest, not whether the justification is "'inaccurate or unfair.'" *Id*. (quoting *O'Leary v. Accretive Health, Inc*., 657 F.3d 625, 635 (7th Cir. 2011)). To meet the burden of showing that Defendant's reason was pretextual, Plaintiff must "'identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the] . . . proffered reasons that a reasonable person could find them unworthy of credence.'" *Id*., (quoting *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 792 (7th Cir. 2007)).

In the present case, Jones' claims of discrimination are founded on just a handful of facts–only the first of which is disputed. Jones claims that in early March of 2012, Andersen told him he was being replaced as plant manager due to his "age and health'; days later, Wallick was hired and Jones was demoted; about seven months after that, in October of 2012, Jones' pay was cut; a couple of weeks after his pay was cut, Jones was told that he would be terminated (or forced to retire, as the case may be) by the end of the year; and Jones was never told about, or disciplined for, the alleged performance problems expressed by Wallick. This is not a complex mosaic of events. And it might not be enough to win over a jury (and won't, if the jury accepts B & J's proffered nondiscriminatory explanation for terminating Jones). But it is sufficient to survive summary judgment. It is well established that when analyzing employment discrimination cases, a court does not sit as a "super-personnel department," second-guessing an employer's decision to reprimand, discipline, suspend, or even terminate an employee. *Ptasznik*

23

*v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006). "But we must also resist the temptation to act as jurors when considering summary judgment motions." *Coleman*, 667 F.3d at 862. Examining the evidence as a whole, and drawing all reasonable inferences in favor of the Plaintiff, the scenario (or "mosaic" if one prefers) that Jones presents in opposition to B & J's motion is sufficient to push the ball over the goal line (or perhaps a field goal might be a more apt metaphor). The court concludes that there are genuine issues of material fact present in this case and that the Defendant's motion for summary judgment, with the exception noted above regarding the Plaintiff's demotion, must be denied.

## CONCLUSION

For the reasons discussed above, the motion for summary judgment filed by the Defendant, B & J Rocket America, Inc. (DE 20) is GRANTED in part and DENIED in part. The motion is granted as to the Plaintiff's claims against the Defendant based on his demotion. The motion is denied as to the Plaintiff's claims based on his termination.

Date: December 1, 2015.

 /s/   William C. Lee   
William C. Lee, Judge
U.S. District Court
Northern District of Indiana
